# Grubb's Appeal.

1. The Act of April 27th 1855, ¿ 3 (Illegitimates), does not legitimatize illegitimate children, it only gave the child and mother capacity to inherit from each other as next of kin and heirs.

2. The words of the act confine its operation, as regards the child, to estate taken and inherited from the mother, leaving all her property derived from any other source unaffected by the act.

January 21st 1868. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. STRONG, J., at Nisi Prius.

[Grubb's Appeal.]

Appeal from the decree of the Orphans' Court of Chester County, No. 184, to January Term, 1868.

In the court below the proceedings were for the distribution of the estate of Edith Jones, deceased, in the hands of her administrator, appearing by his account, confirmed June 11th 1867, to be $3812.75.

It appeared from the facts found by the auditor, P. F. Smith, that Edith Jones was the only child of Phebe Jones, deceased, and was illegitimate. Phebe Jones left to survive her several brothers and sisters, who are dead, leaving descendants of whom Henry Grubb is one. Edith died intestate, unmarried and without children.

Information having been made to the Auditor-General that Phebe Jones' estate was an escheat, an inquisition was held, which found the foregoing facts, and that her estate had *not* escheated to the Commonwealth.

Exceptions to this finding were filed on behalf of the Commonwealth and the informer " that upon the facts found by the inquest, their conclusion is erroneous and against law, and should have been a finding in favor of the Commonwealth, that the estate do escheat."

The exceptions were afterwards withdrawn.

The auditor reported that by reason of the finding of the inquest neither the Commonwealth nor the informer had any standing in the proceedings. He further reported—" We are thus brought to the question : To whom is the fund to be distributed ?

" The question arises under the Act of April 27th 1855, Pamph. L. 368, Purd. 565, pl. 40, ' to amend certain defects of the law for the more just and safe transmission and secure enjoyment of real and personal estate.' The third section enacts ' that illegitimate children shall take and be known by the name of their mother, and they and their mother shall respectively have capacity to take or inherit from each other personal estate as next of kin and real estate as heirs in fee simple, and as respects said real or personal estate so taken and inherited, to transmit the same according to the intestate laws of the state.'

" The point to be determined is—can the next of kin of Phebe Jones take as the next of kin of Edith Jones, as if Edith were a daughter of Phebe born in wedlock. If what has before been said as to the effect of the finding is correct it would seem that the point at issue in this case has been determined by a competent tribunal and is binding until reversed. For if she had no known heirs or next of kin the estate must have escheated. In point of fact she has no such relations except as she traces them through her mother. The jury must therefore have decided on this question and between the same parties, that within the meaning of this act the relatives of her mother are her next of kin. But looking at the question as *res nova*, what is the proper construction of this

section ? The title of the act declares that its purpose is to remedy 'certain defects in the law for the more just transmission of estates,' and it may aid in discovering the intent of the legislature : Dwarris on Stat. 654. With us where the title to an act is given by the framer of the statute, it may be entitled to greater weight than in England, where it is usually framed by the clerk of the House : Id. 653. Here too the title may be esteemed to have some of the qualities of a preamble, and may therefore 'be used as a good means for collecting the intent of the makers.'

" The subjects of the several sections are distinct, indicating that the legislature designed a generally remedial statute. It should therefore be largely expounded, according to its equity and spirit, although the case be not within its letter : Brinker v. Brinker, 7 Barr 55 ; Levering v. Germantown Railroad, 8 W. & S. 463 ; Deddrick v. Wood, 3 Harris 12 ; Dwar. 718. Such statutes may also be extended to other cases, within the same mischief and occasion of the act, though not expressly within the words and to persons besides those expressly named : Dwar. 718, 721. The old law was, that children born out of wedlock could not inherit, for two reasons : one as a penalty for the offence of which *they* were innocent ; the other, as regards the father, on account of the uncertainty of ascertaining who he was. In regard to the mother, no such uncertainty could exist, and the first reason, a cruel and unjust one, alone remained. This was the mischief and it was not a 'just transmission' of estates, to give the property of a decedent to the Commonwealth, when there were near relatives who could be ascertained with certainty, simply because the relationship could not be traced through a marriage. The act was passed to provide a remedy for this, and it is contended for the Commonwealth, that the remedy extends no further than to allow the mother and child to take from each other. But would not this be a very partial correction of the defect of the law ? The injustice and unreasonableness of the law would operate as certainly (although more remotely, and less sensibly) on a distant relative, as on a child or a mother, and besides in the provision for the mother and the exclusion of the other relatives, so far as the idea of penalty is involved, you lay it on the innocent and release the offender. This act, as other acts, is to have such construction as shall suppress the mischief and advance the remedy, and to suppress subtle inventions and evasions for countenance of the mischief and *pro privato commodo*, and to add force and life to the cure, and remedy according to the true intent of the makers of the Act, *pro bono publico :* Heydon's Case, 3 Rep. 7 b, and note B. to Thomas' edition. In the opinion of the auditor, to limit the transmission of estates to the mother and daughter, would be a 'continuance of the mischief,' partially at least. In support of this, it may be said that the including of the mother, as before

referred to, would indicate that the legislature designed mainly, if not solely, to secure certainty in finding the relatives of the decedent, and subject to this, to make no distinctions which had not heretofore been made among legitimates. We have seen that an act may be extended by its equity and spirit to persons and cases not within the words or not expressly named, if within the mischief, and if the reasoning of the auditor be correct, that the relatives of Phebe Jones are within the mischief, does the act expressly or by unavoidable implication exclude them? The auditor can discover nothing in the act that so operates. The act declares that the mother and daughter shall inherit from each other—that is, each is to take title to the estate of the other as her 'heir at law'—which means lawful heir. Making her the lawful heir would give her not only the capacity to take, but also to transmit as lawful heir, and would determine who were her collateral as well as her lineal heirs. Miller's Appeal, 2 P. F. Smith 113, although perhaps not strictly this case, it is supposed, goes on the principle, when it is considered that the argument for the Commonwealth (that relatives of such decedent to inherit must take directly from her and cannot take through a deceased mother) would exclude lineals of the deceased mother or daughter as well as collaterals. The auditor thinks that upon the position of the Commonwealth the concluding clause of the section would be meaningless. This clause says ' as respects said real and personal estate so taken and inherited, to transmit the same according to the intestate laws of the state.'

" Before this act the decedent's estate would be transmitted under the intestate laws to her own descendants. The act could not enlarge this unless it contemplated a transmission to collaterals. She could have no collateral heirs except through her mother : then if the act does not authorize a transmission through the mother, there is nothing more than before in the way of transmission. It was suggested that this clause, whatever in this respect its effect may be, acts only on the specific estate actually taken; but this seems to be a mere verbal criticism—that the spirit of the clause is to refer it to any estate authorized by it to be so taken and inherited.

" This act has not come under the consideration of the courts in the aspect here presented, so far as the auditor is aware. It is referred to in Killam *v.* Killam, 3 Wright 120, and Opdyke's Appeal, 13 Id. 373. In those cases are some expressions in the arguments of the judge, who delivered the judgment of the court, which bear on the question here discussed, and which, so far as they go, appear to support the views of the auditor. But if this be so, he does not refer to them as ruling the question, as it was not then directly presented.

" On the whole, the auditor is of opinion that the act under

[Grubb's Appeal.]

consideration was intended to remove all taint of blood as between mother and daughter in the circumstances which obtain in this case, and to create an inheriting capacity not only from but through each other, just as if the relation had arisen through lawful wedlock."

The auditor accordingly distributed the fund amongst the collateral relatives of Phebe Jones, the mother of the decedent.

Exceptions were filed to the report, after argument, the court (Butler, P. J., delivering the opinion) said, amongst other things:—

"It is the first part of the section alone, in our judgment, that produced any change in the distribution of intestate estates. As before remarked, the language *here* used is clear, free from all ambiguity. And if confined to its terms, it had no greater effect than to give the property of the mother to her illegitimate child, and that of the child to the mother. But in this case the kindred of the mother claim for it a much broader operation. While' they admit that the terms of the provision do not embrace them, they urge that its spirit does.

"This presents the question, first, may the statute be given a liberal construction to effect a supposed legislative design, or must it be construed strictly? And, second, if it may be given such liberal construction, is it clear that the case presented falls within its spirit. As to the first of these questions, we believe the statute belongs to a class that requires strict construction. In relation to this we will content ourselves with referring to the authorities: Johnson *v.* Haines, 4 Dallas 64; Preston *v.* Hoskins, 2 Yeates 545; Cresoe *v.* Laidley, 2 Binn. 279; Kent *v.* Baker, 2 Grey 335; Curtis *v.* Hewes, 11 Metc. 294; Doe *v.* Bates, 6 Blacks. 533; Stevenson *v.* Sullivant, 5 Wheat. 207; Bent *v.* St. Vrain, 30 Misso. 268; Little *v.* Lake, 8 Ohio; Remington *v.* Lewis, 8 B. Monroe 606; Hunt *v.* Hunt, 37 Maine 341.

"But suppose it be granted that the statute may receive a liberal construction; is it clear that the case falls within its spirit? The object of the section, as expressed in the title to the act, was to 'amend certain defects in the law for the more just transmission of estates.' This object will certainly be attained if we confine the operation of the section to cases falling within its express terms. To provide that illegitimate children shall take their mother's estate, and she take theirs, in cases of intestacy, is certainly amending a serious 'defect in the law' and securing a 'more just transmission of estates.' Let it be granted that this does not cure *every* defect touching the subject to which it relates; yet if the language used be clear, we cannot undertake to extend it, so as to cover other supposed imperfections, because we conceive that they too should have been embraced. This would render the scope of a statute very uncertain. As was remarked

by Chief Justice Tilghman, in Cresoe *v.* Laidley, 2 Binn. 286, 'there will be no end to difficulties if we attempt to supply the supposed omissions of the Acts of Assembly by inserting what we may suppose to have been intended by the legislature.' But suppose the court at liberty to extend the operation of the section so as to cover *all* 'defects in the law' touching the subject to which it relates, still is it clear that the case before us would come within its scope? In other words, is it a 'defect in the law' that it does not give the estates of illegitimate children to the kindred of the mother? In our judgment it is not. The intestate laws are based upon the presumed desire of the intestate himself. His property is given to his kindred, commencing with those nearest in degree—not because of the kinship itself, but of the affection which is presumed to have existed between him and them, and the desires and consequences growing out of it. But for this, there would be no more reason why his estate should be given to his kindred than to strangers. Justice demands that the property accumulated by the parent shall pass to his child, because it is deepest in his affections, and to it therefore he would naturally desire his property to go. But all experience attests, that between the kindred of the mother and her *bastard* child, there is *no affection*. She has committed a crime (a crime for which society has no charity), and is disgraced beyond hope. By her kindred the act is resented as one bringing shame upon them, as well as upon herself. They cast her off, and the feeling of unkindness extends beyond her to her child, even in a greater degree. *It* seems to be regarded as an ever-existing reproach, continually reminding the community of the disgrace its mother brought upon her family. · The truth of this is strikingly illustrated in the case of this very intestate, Edith Jones, whose grandfather sought by means of a trust, to guard against the possibility of any part of his estate ever coming to his daughter's illegitimate child. We do not therefore believe that to give the property of illegitimate children to the kindred of the mother, would be providing 'for a more just transmission of estates.'

"And there is nothing in the way of the legislature conferring upon illegitimates all the *advantages* of legitimacy so far as respects the mother, without doing this; as the statutes of Virginia, Ohio and some others of the states, exhibit.

"We believe the section in question was intended to do precisely what its terms express, to give the estate of the mother to the child, and of the child to the mother, with power to transmit it as any other property possessed by them, and to do no more. *This* justice did plainly require to be done. If more had been designed we cannot believe the language used would have been employed. Had it been intended to *legitimate* the child fully as respects the mother and her kindred, it would have

[Grubb's Appeal.]

been easy to say so, and have required fewer words than were employed.

" If it be objected that this view of the statute will exclude the issue of an illegitimate child from the estate of the grand-mother, where she survives her child, it must be answered that such was held to be the effect of similar statutes in Massachusetts and Tennessee, where the court suggested that such an objection is more proper for the consideration of the legislature than the court.

" We do not think the Pennsylvania cases cited have much bearing upon the question. In Miller's Appeal, 2 P. F. Smith 113, the bastard had been fully and completely legitimated—was in express terms given ' all the rights and privileges of a child born in lawful wedlock, capable in law to inherit and transmit any estate whatever as fully and completely and to all intents and pur-poses as if she had been born in lawful wedlock.' There could not be much doubt about the effect of this statute; and the case fell plainly within its terms. Killam v. Killam, 3 Wright 120, was precisely similar to the preceding case. The legislature had in plain terms, fully legitimated the bastard children, giving them, in the language of the statute, ' all the rights, privileges, benefits and advantages of children born in lawful wedlock, capable in law to inherit and transmit any estate whatever as fully and com-pletely to all intents and purposes as if born in lawful wedlock.' The statutes involved in these cases show that when the legislature intends to *legitimate* a bastard it employs no uncertain language, leaving the matter in doubt. Opdyke's Appeal, 13 Wright, grew out of the act under consideration. But the case fell plainly within its express terms. The judge delivering the opinion says: ' It would clearly be legislation on our part' to say that bastards have not capacity to take under the facts exhibited in that case." In other words, the court would have to interpolate the statute to exclude them; as we would have to do to include the mother's kindred in this case.

" We think the cases of The Commonwealth v. Nancrede, 8 Casey 389, and Schafer v. Eneu, 4 P. F. Smith 304, relating to the rights and capacities of *adopted* children, who, by the Act of May 4th 1855, are made *heirs* of the adopting parent, are fully as important to our inquiry as those just cited.

" But much more important are the cases which have arisen under statutes similar to ours, relating to bastards, in the several states around us. We think it will be found that although the language used in these statutes is less guarded, and of broader signification than that employed in ours, the courts have uni-formly refused to give to it the extended effect contended for in the case before us.

" In Virginia it was early enacted ' that bastards shall be

capable of inheriting or transmitting inheritance on the part of 'their mother, in like manner as if they had been lawfully begotten of such mother.' Here was certainly better reason than in our case for claiming that the provision fully legitimated the bastard as respects the mother, removing all impediments to inheritance between it and the mother's kindred. Yet in Stevenson *v.* Sullivant, 5 Wheat. 207, the Supreme Court of the United States deny it this effect, confining the language to its narrowest and most restricted signification. Judge Washington says : ' What is the legal exposition of the expressions employed ? We understand it to be that they (the bastards) shall have capacity to take immediately or through their mother in the ascending line and to transmit the same to *their line as descendants.*' And he therefore held that the statute did not create the relation of brother between legitimate and illegitimate sons of the same mother, so as to enable the one to inherit from the other.

" In Kentucky the provision just cited from the statute of Virginia was adopted in 1796. And under it the Supreme Court of that state, following Stevenson *v.* Sullivant, held that the *mother* could not take the estate of her illegitimate child. In 1840 the legislature passed a supplement, providing that the ' mother of a bastard shall be capable of inheriting from it as heir ; and that brothers and sisters, born of the same mother out of wedlock, shall be capable of inheriting from each other as though born in lawful wedlock.' Here was legislation apparently much broader in its scope than ours ; yet in Remington *v.* Lewis, 8 B. Monroe 606, C. J. Marshall said : ' It is impossible upon any admissible construction of the act to consider it as establishing a legal relationship for purposes of inheritance between a bastard and any of his natural relations but his mother and her illegitimate issue. And we do not feel at liberty on any conjectural motive of justice or policy to assume that the legislature intended to effect any object not embraced in a fair construction of the words used, nor can we upon any such assumption extend their operation of the act.' He therefore held that *legitimate* and illegitimate children of the same mother could not take from each other.

" In Tennessee the statute provides ' that if a woman die intestate leaving a natural born child or children, such natural born child or children shall take as heir to the mother ; and in case of intestacy without issue, the brothers and sisters of such natural born child or children shall inherit from him or them.' Under this act the Supreme Court of that state, in Brown *v.* Kerby, 9 Humphrey 460, held that the bastard could not take his mother's share of the grandfather's estate, she being dead. The court said : ' The question is, Can the bastard take by representation from his grandfather ? It is clear he cannot. A bastard is *filius*

*nullius*, and therefore has no inheritable blood. The statute has to a certain extent modified this principle. * * * But it does not go to the extent insisted upon. It makes the bastard heir and distributee of the mother, but extends its right no further; and the child can inherit no estate under its provisions from the relatives, lineal or collateral, of the mother.'

"In Missouri the statute is in the same words as that of Virginia, making the bastard ' capable of inheriting and transmitting inheritance on the part of the mother, in like manner as if lawfully begotten.' In Bent *v.* St. Vrain, 30 Missouri 268, the Supreme Court of that state decided that the mother could not take from her bastard child, confining the language of the statute to its narrowest signification. The opinion of the court in this case is very elaborate, and will be found interesting.

"In Ohio, as in Kentucky, they have adopted the language of the Virginia statute, with an additional provision, allowing the mother to take from her illegitimate child. Under it the kindred of the mother claimed to take (Little *v.* Lake) the property of her bastard child, and the case seems much like ours, except that the language of the statute there is apparently broader in its terms. The court denied the claim.

"In Massachusetts the Revised Statutes provide ' that an illegitimate child shall be considered as an heir of his mother and shall inherit her estate in like manner as if he had been born in lawful wedlock.' In Curtis *v.* Hewes, 11 Metc. 294, this language, as we have already seen, received a construction so strict as to exclude the bastard's children from the estate of his mother, where he died in her lifetime.

"Having determined that the kindred of Phebe Jones, the mother, cannot take as next of kin of Edith Jones, the intestate, we cannot award the fund to them.

"And this, it might seem, should decide the case. For if *they* are not entitled to it, certainly it has escheated to the state.

"But the Supreme Court having determined in Crawford *v.* Commonwealth, 1 Watts 480, that the state must first establish its title to escheated property before an *inquest*, in pursuance of the Acts of Assembly, we cannot award the fund to it, unless we find this to have been done. The counsel representing the state claims that it has been done. Although the jury returned that the property has *not* escheated, he insists that the finding is in favor of the state, because he says the inquest is simply to ascertain the facts, and these were found in favor of his client. If it be true that a finding of the facts upon which an escheat depends, in favor of the state, will establish its title, although the jury may add that the property has *not* escheated, still we do not think the state can rest upon the return made in the case before us. An escheat occurs where one dies intestate, possessed of

[Grubb's Appeal.]

property, without heirs or known kindred, or surviving husband or wife. These facts must all be found in favor of the state to establish her title.

"Here two essential facts are not found: that she died intestate, and without a husband surviving. It is true the 3d section of the Act of September 29th 1787, provides that the jury shall be summoned to inquire whether the deceased left 'heirs or known kindred.' But since the Act of April 1853, relative to the same subject, the jury cannot stop at this inquiry; nor do we believe it could before. Necessarily, even in the view taken by the counsel for the state, it must determine all the facts upon which the question of escheat depends. We think therefore the return of the inquest held, cannot in any view that may be taken of it, be regarded as a finding in favor of the state.

"Then is this return *conclusive*: or may further action be had under the Acts of Assembly? If it is conclusive, what becomes of the property? If the state cannot take further action to establish its title, the court can make no distribution; and the property must remain in the hands of the administrators (supposing our view of the Act of 1855 to be correct). For the finding of the inquest cannot govern or influence the Orphans' Court in determining who is entitled to take as next of kin; in this respect it is wholly unimportant.

"But we do not think the state is concluded by what has taken place. To hold that it is, in view of the fact that the jurors in such cases are without knowledge of the law, and that there is no provision for appeal to a tribunal possessing such knowledge, would seem to be unreasonable, as it would leave the state without remedy in cases of the plainest mistake. The finding is not the judgment of a court; but the answer of individuals summoned by the state itself, to inquire of certain facts, about which it desires to be informed. If the answer be favorable to the state, it binds no one in the first instance; a trial must still take place in a court of law, if any one liable to be prejudiced desire it. We do not believe it was contemplated that the finding of the inquest should be binding upon the state, while it is not upon her antagonist. And this view receives some support at least from Slaughter's Case, 8 Co. 160, and Ex parte Duplessis, 2 Ves. Sr.

"Having stated our views of the case we will withhold the decree until the state, or some other claimant, shall present itself, clothed with authority to demand the fund."

A second inquest was afterwards held which found that the estate of Edith Jones had escheated.

Upon which the court ordered as follows: "The Commonwealth having now established her title to the fund in controversy as escheated property, before an inquest held in pursuance of the Acts of Assembly, and in court on a traverse of the return, we

must decree that the money in the administrator's hands be paid over to her, in accordance with the views stated at length in our opinion previously filed in this case—the distribution reported by the auditor being set aside."

From this decree Henry Grubb appealed and assigned 'it for error.

*J. H. Brinton*, for appellant, cited Diller's Appeal, 2 P. F. Smith 116; Killam *v.* Killam, 3 Wright 123; Opdyke's Appeal, 13 Id. 373; Packer *v.* Sunbury Railroad, 7 Harris 211; Act of April 27th 1855, § 3, Pamph. L. 368, Purd. 568, pl. '40.

*W. Darlington*, for appellee.

The opinion of the court was delivered, January 30th 1868, by READ, J.—Edith Jones, of Chester county, died in the year 1866. She was the daughter of Phebe Jones, who was never married and who died before her daughter, leaving brothers and sisters or their descendants, and Edith died unmarried and without issue, and without heirs or any known kindred, unless the 3d section of the Act of 27th April 1855, Pamph. L. 368, brings the brothers and sisters of her mother or their descendants within the class of "heirs or known kindred." This section gave capacity to the mother and child respectively to take and inherit from each other as next of kin and heirs, but it did not legitimate the child as was done by the Act of May 1857, Pamph. L. 507, in regard to children born before the marriage of their parents. As the mother died first, her brothers and sisters were not made, by the act first named, the next of kin or heirs of the daughter who had no inheritable blood, except in relation to her mother, which died with the parent.

The words of the act are very special, confining its operation as regards the daughter to real and personal estate taken and inherited from the mother leaving all her property derived from any other source unaffected by the Act of 1855. The court below say, " That no part of the fund for distribution, so far as appears, was derived by the deceased from her mother."

"And as respects said real or personal estate so taken and inherited," says the section, "to transmit the same according to the intestate laws of this state." "We incline to the opinion," say the court below, "that this clause was inserted to express the absolute character of the estate which the mother and child were respectively to take, and possibly under the mistaken notion, that it was necessary to procure the further transmission of what might be so taken."

The court are probably right in this conjecture, but in any view of the case before us, we think Edith Jones died without heirs or

8 P. F. SMITH—5

[Grubb's Appeal.]

any known kindred. The elaborate opinion of the learned judge in the court below renders it unnecessary to discuss this question at greater length.

The property having escheated to the Commonwealth the only remaining question is, have the proper proceedings been taken to vest the title to receive it in the state. An inquest had been held containing facts on its face contradicting the finding of the jury, and the court held that no one had presented themselves entitled to receive the fund from the administrators.

A second inquest was then held which found that the estate of Edith Jones had escheated to the Commonwealth. Henry L. Grubb traversed the inquisition, and upon the trial the jury found a verdict for the plaintiff, the Commonwealth, and a judgment was entered accordingly that the estate had escheated. To this Mr. Grubb has taken a writ of error, and the only point presented for our consideration is the question already decided, the true construction of the Act of 1855.

The question of the regularity of these proceedings has not been pressed upon our attention, nor do we decide whether they are or not regular, but as it is evidently the interest of all parties that the main and only real question should now be disposed of, the appeal is dismissed at the cost of the appellant.

Judgment is affirmed.

SHARSWOOD, J., filed a dissenting opinion.